## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JEROME NIBBS,**

Plaintiff,

**v.**

**UNITED STATES OF AMERICA,**

Defendant.

CIVIL NO. 3:24-cv-01290-ADC

## UNITED STATES' MOTION AND ITS MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL DISMISSAL OF PLAINTIFF'S AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION

The United States of America respectfully submits this Motion and Memorandum in Support of its Motion for Partial Dismissal of Plaintiff's Amended Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

    I.     International Background ........................................................................... 3

        A. 1988 Vienna Counter-Trafficking Convention ...................................... 3

        B. United States/United Kingdom Bilateral Agreement .......................... 4

    II.    Domestic Framework ................................................................................. 5

    III.   Facts ......................................................................................................... 5

LEGAL STANDARD OF REVIEW ......................................................................... 7

ARGUMENT ........................................................................................................... 8

    I.     First Two *Baker* Factors ........................................................................ 9

    II.    Four Prudential Baker Factors ............................................................... 14

    III.   Persuasive Precedent in an Analogous Case ........................................... 16

CONCLUSION ........................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases:**                                                                                                  **Page(s)**

*Aktepe v. United States*,
  105 F.3d 1400 (11th Cir. 1997) (en banc) ................................................................. 14

*Al-Tamini v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) ...................................................................... 8, 14, 15

*American Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) .................................................................................. 10, 11

*Baker v. Carr*,
  369 U.S. 186 (1962) ........................................................................ 9, 10, 11, 15, 19

*Corrigan v. Boston Univ.*,
  98 F.4th 346 (1st Cir. 2024) .................................................................... 8

*Eveland v. Director of CIA*,
  843 F.2d 46 (1st Cir. 1988) ...................................................................... 18

*Haig v. Agee*,
  453 U.S. 280 (1981) ............................................................................. 10-11

*Harbury v. Hayden*,
  522 F.3d 413 (D.C. Cir. 2008) ................................................................ 8

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221, 230 (1986) ....................................................................... 9

*Mercado Arocho v. United States*,
  455 F. Supp. 2d 15 (D.P.R. 2006) ............................................................. 7

*Murphy v. United States*,
  45 F.3d 520 (1st Cir. 1995) .................................................................... 8

*Nixon v. United States*,
  506 U.S. 224 (1993) ............................................................................ 10

*Oetjen v. Central Leather Co.*,
  246 U.S. 297 (1918) ............................................................................ 10

*Schlesinger v. Reservists Comm. to Stop the War*,
  418 U.S. 208 (1974) ............................................................................. 8

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005) ............................................................. 9, 10

*Ungar v. Palestine Liberation Org.*,
  402 F.3d 274 (1st Cir. 2005) ................................................................ 9, 10

*United States v. Cardales-Luna*,
  632 F.3d 731 (1st Cir. 2011) ..................................................................... 15

*United States v. Gil-Martinez*,
  980 F. Supp. 2d 165 (D.P.R. 2013) .......................................................... 15

*United States v. Nibbs*,
  643 F. Supp. 3d 299 (D.P.R. 2022) ................................................. 1, 5, 7

*United States v. Stanley*,
  483 U.S. 669 (1987) .................................................................................. 10

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004) .................................................................................... 9

*Weir v. United States*,
  518 F. Supp. 3d 1 (D.D.C. 2021) ...................................................... 14, 17

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) .................................................................................. 14

## Constitution and Statutes:

U.S. Const. art II, § 2 ................................................................................ 10

14 U.S.C. § 101 .......................................................................................... 10

46 U.S.C. § 70501 ........................................................................................ 5

46 U.S.C. § 70502 ................................................................................. 12, 15

## Rule:

Fed. R. Civ. P. 12(b)(1) .......................................................................... 1, 7

## Other Authorities:

86 Fed. Reg. 71549 (Dec. 15, 2021) ........................................................ 11

Wright & Miller, Federal Practice & Procedure § 3534.2 (3d ed. 1998) ................. 11

*United Nations Convention Against Illicit Traffic in Narcotic Drugs and
  Psychotropic Substances*, 28 I.L.M. 493, 498, 1989 WL 503670 (1989) .............. 3, 5

**INTRODUCTION**

Between June 16 and July 22, 2022, Plaintiff Jerome Nibbs was detained aboard a series of United States Coast Guard vessels while the United Kingdom and the British Virgin Islands ("BVI") determined whether they would waive their jurisdictional right to prosecute him for smuggling drugs in the Caribbean. Consistent with international law, and the United States—United Kingdom bilateral agreement that has been in effect for the past quarter of a century, the United States began the process of obtaining this waiver the same day the Coast Guard interdicted Plaintiff's drug smuggling boat. The Coast Guard continued to work throughout this 36-day period to obtain this waiver from the U.K. The same day the United States received confirmation of the jurisdictional waiver, the Coast Guard put Plaintiff ashore for prosecution in this country.

Even though the presiding judge in the criminal case found the delay in bringing Plaintiff to shore was "reasonable," *United States v. Nibbs*, 643 F. Supp. 3d 299, 303 (D.P.R. 2022), Plaintiff now seeks compensation because of the duration of his detention and the conditions of his confinement aboard Coast Guard vessels. This motion addresses only Plaintiff's complaint about the duration of his detention.[1]

Plaintiff's complaint about the duration of his detention must be dismissed for lack of subject matter jurisdiction because the Supreme Court's political question

---

[1] The United States is separately filing a second motion for partial dismissal regarding Plaintiff's allegations about his conditions of confinement aboard the Coast Guard vessels to the extent they are based on any claim he should have been detained below deck.

doctrine, which is a function of the separation of powers, makes this a non-justiciable question. Under that doctrine, the Court cannot intrude upon foreign relations where (1) the specific issue is Constitutionally committed to the political branches, and/or (2) where there are no judicially manageable standards for resolving the issue.

First, the conduct of foreign relations is generally constitutionally committed to the political branches, and the Executive Branch has entered into bilateral agreements pursuant to this authority, like the one governing its actions here, since the early days of the Republic. Second, there are no judicially manageable standards by which this Court might evaluate the Executive Branch's decision to comply with its international agreement or to press the U.K. harder or in some different way to obtain the waiver sooner. Doing so would risk damaging bilateral relations, a cost-benefit risk-analysis the Court is not well-positioned to conduct.

As a result, this Court must dismiss for lack of subject matter jurisdiction any allegations in Plaintiff's Amended Complaint based on the duration of his detention.

## BACKGROUND

When Plaintiff's drug boat was interdicted in the Caribbean Sea on June 16, 2022, and the Coast Guard engaged in consultation with the United Kingdom to secure its waiver of jurisdiction to prosecute him, the United States was adhering to international law, a bilateral agreement, and domestic criminal law.

## I.    International Background

### A.  1988 Vienna Counter-Trafficking Convention

In 1990, the United States Senate ratified the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (Vienna, 1988) ("Vienna Convention"), 28 I.L.M. 493, 498, 1989 WL 503670 (1989).    This international treaty is one of the most widely signed in existence, with 191 States Parties.[2]   All thirteen independent Caribbean Island countries either ratified or accessed the Convention.

Countries representing most of the world enacted the agreement "due to the magnitude of international criminal trafficking in narcotics and psychotropic drugs, the link between this illicit trafficking and related organized criminal activities, and the adverse effect of this on the foundations of society and the security of the party states."  Fern Kletter, Annotation, *U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Dec. 19, 1988,* 1582 U.N.T.S. 95, 28 I.L.M. 493 (1989), 35 A.L.R. Fed. 3d Art. 6 (2018); *see also* Vienna Convention, 28 I.L.M. 493, 497 (recognizing that illicit trafficking "threaten[s] the stability, security and sovereignty of States").  The States Parties reached this agreement "to improve international co-operation in the suppression of illicit traffic by sea," the eradication of which "*is a collective responsibility of all States.*"  Vienna Convention, 28 I.L.M. at 498 (emphasis added).  Absent such effort, the wealth of illicit trafficking "enabl[es]

---

[2] United Nations Treaty Collection; list of signatories and parties available at https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=VI-19&chapter=6&clang=_en#14.

transnational criminal organizations to penetrate, contaminate and corrupt the structures of government . . . and society at all its levels." *Id.* Parties to the U.N. treaty agree to adopt measures against drug trafficking and to provide a means for international cooperation in criminal prosecution. The treaty specifically contemplates "investigations, prosecutions and judicial proceedings" in relation to criminal offences. *Id.* at 508.

Article 17 of the treaty addresses international cooperation to suppress illicit trafficking by sea. The States agreed to a procedure by which one State may request authorization from another State to board a vessel possessing the latter State's nationality, to search it, and to "take appropriate action with respect to the vessel, persons and cargo on board." *Id.* at 519. "The [vessel's] flag State may, consistent with its obligations in paragraph one of this article, subject its authorization to conditions to be mutually agreed between it and the requesting Party, including conditions relating to responsibility." *Id.* Under the treaty, parties are encouraged to enter bilateral or regional agreements to carry out the provisions of Article 17. *Id.* As explained below, the United Kingdom and the United States did just this.

### B. United States/United Kingdom Bilateral Agreement

In 1998 the United States and the United Kingdom entered a bilateral agreement to "promote greater cooperation between [them] in combatting illicit [drug] trafficking by sea in the waters of the Caribbean and Bermuda." Exhibit 1, Agreement Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland

4

Concerning Maritime and Aerial Operations to Suppress Illicit Trafficking by Sea in Waters of the Caribbean and Bermuda ("The 1998 U.S.—U.K. Agreement").

As is relevant here, where a master claimed British nationality for the vessel and crew, *Nibbs*, 643 F. Supp. 3d at 301; Dkt. No. 14, Am. Compl. ¶ 8, the U.K. overseas territory "shall have the primary right to exercise jurisdiction over [the] detained vessel, cargo and/or persons on onboard." The 1998 U.S.—U.K. Agreement, Art. 10. Even so, under the agreement, the U.K. may "waive its primary right to exercise jurisdiction and authorise the enforcement of U.S. law against vessel, cargo and/or persons on board." *Id.*

## II.    Domestic Framework

Article 3 of the Vienna Convention mandates that each State Party shall adopt measures to establish criminal offenses for illicit trafficking under its domestic laws. Vienna Convention, 28 I.L.M. 493, 500—03. Congress did just that and enacted the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70501 *et seq.* Under the MDLEA, a vessel is subject to the jurisdiction of the United States when, among other reasons, the United States obtains either the consent of or a waiver of jurisdiction by the foreign nation where the vessel is registered. *Id.* § 70502(c)(1)(C).

## III.    Facts

On June 16, 2022, the United States Coast Guard detected a maritime target of interest approximately 25 nautical miles from Saint Thomas, U.S. Virgin Islands. *See* Dkt. No. 14, Am. Compl. ¶ 6. The Coast Guard boarding team gained control of the target vessel and its occupants, one of whom was Plaintiff, and recovered some of

the bales of cocaine that the crew from the drug boat had jettisoned, Am. Compl. ¶¶ 7—9.

Because the master of the drug boat claimed British Virgin Islands nationality for himself and the vessel, *see id.* ¶ 8, the Coast Guard began—the same day—the process outlined in the 1998 U.S.—U.K. Agreement of seeking a waiver of jurisdiction by the British that would allow the Coast Guard to bring Plaintiff and the others ashore to prosecute them. Exhibit 2, Declaration of U.S. Coast Guard Commander Ian M. Starr ¶¶ 6, 8b ("CDR Starr Decl."). Commander Starr of the U.S. Coast Guard was detailed at the time to the State Department's Bureau of International Narcotics and Law Enforcement Affairs. *Id.* ¶¶ 3, 6. In that role, he served as the delegee for the Secretary of State's certification authority under the MDLEA to ensure that jurisdictional waivers were obtained and properly certified in federal court. *See id.* ¶¶ 3—5.

Three days after the interdiction, Commander Starr completed the necessary internal multi-agency Government coordination. *See id.* ¶ 8b, c. He then requested that the United Kingdom waive jurisdiction to allow the United States to prosecute Plaintiff. *Id.* For almost four weeks Commander Starr "engaged in multiple attempts to obtain the waiver of jurisdiction" from the U.K. *Id.* ¶ 8d. On July 14, nearly one month after the interdiction, Commander Starr was informed for the first time that BVI had agreed to the waiver, though that agreement came with the caveat that it would be "followed by a formal diplomatic note." *Id.* ¶ 8e. Neither Commander Starr nor his chain of command was clear that this caveated waiver was sufficient under

6

the 1998 U.S.—U.K. Agreement and the MDLEA to allow the United States to prosecute Plaintiff. *Id.* ¶ 8f. As a result, Commander Starr sought this critical clarification within the U.S. Government, with the BVI Government, and with the U.K. Government in London. *Id.* ¶ 8g.

On July 21, one week after the initial waiver, BVI re-affirmed its earlier waiver and the next day, July 22, the U.K. Government in London concurred that it had waived jurisdiction to prosecute Plaintiff. *Id.* ¶ 8h, i. The same day the Coast Guard received London's concurrence, the Coast Guard put Plaintiff ashore in Puerto Rico for his initial appearance before the magistrate judge. *See Nibbs*, 643 F. Supp. 3d at 302.

On August 30, 2024, Plaintiff was found guilty after a jury trial on drug trafficking offenses and was sentenced subsequently to ten years in federal prison. *See United States v. Nibbs*, 3:24-cr-00072-MAJ, Dkt. No. 290.

## LEGAL STANDARD OF REVIEW

The United States seeks dismissal of Plaintiff's negligent infliction of emotional distress claim under Rule 12(b)(1) to the extent the claim relies upon the duration of his detention aboard Coast Guard cutters.

When presented with a motion to dismiss under Rule 12(b)(1), a district court must distinguish between a facial and a factual challenge to its jurisdiction. *See Mercado Arocho v. United States*, 455 F. Supp. 2d 15, 17-18 (D.P.R. 2006). A party makes a facial attack when it challenges the jurisdiction based on the allegations of the complaint. *Id.* at 19. In contrast, as the United States does here, a party that

7

makes a factual challenge may present affidavits, exhibits, and other documents outside the pleadings.  *See id.*  No presumption of truthfulness attaches to the complaint's allegations, *see id.*, and the court must resolve any disputed facts.  *See Corrigan v. Boston Univ.*, 98 F.4th 346, 352 (1st Cir. 2024).  Throughout, the party invoking jurisdiction "carries the burden of proving its existence." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995).

## ARGUMENT

Plaintiff's First Amended Complaint must be dismissed to the extent that his negligent infliction of emotional distress claim is based on the duration of his detention aboard Coast Guard cutters because such a claim would be a non-justiciable political question.[3]  The Court has no jurisdiction to hear political questions.  *See, e.g.*, *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974) (non-justiciable political questions deprive the court of jurisdiction); *Al-Tamini v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019) (recognizing the Supreme Court's treatment of the political question as a jurisdictional issue).

The political question doctrine is grounded in the separation of powers in the Constitution.  *See, e.g.*, *Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008).  The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to

---

[3] *See* Dkt. No. 14, Am. Compl. ¶ 23 (referencing what he claims are "inhuman conditions for 36 days"); Exhibit 3, Correspondence between Counsel, dated November 19, 2025, confirming that Plaintiff intends to press his negligent infliction of emotional distress claim based, in part, on the duration of his detention.

the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

Cases presenting non-justiciable political questions typically include one or more of the following factors:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962); *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 280 (1st Cir. 2005). These factors "are probably listed in descending order of both importance and certainty," *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004), and the Court "need only conclude that one factor is present." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).

We will analyze the first two *Baker* factors and then the so-called four prudential *Baker* factors before concluding with the analysis of persuasive authority on all fours with this case.

## I.    First Two *Baker* Factors

The first two *Baker* factors are "not completely separate" because the "lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon v. United States*,

9

506 U.S. 224, 228-29 (1993). We address first whether the issue here is textually committed to the political branches because determining justiciability requires an analysis of the "particular question" being asked. *See Ungar*, 402 F.3d at 280. By challenging the duration of his detention while the United Kingdom weighed whether to waive its jurisdiction to prosecute one of its own citizens, Plaintiff is challenging the Coast Guard's implementation of and reliance upon a bilateral agreement with the U.K. and ultimately the Executive Branch's decision-making in the context of foreign relations.

"The conduct of the foreign relations of our Government is committed by the Constitution to the executive and legislature—the 'political'—departments of the government." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918); *see also Schneider*, 412 F.3d at 195 ("Just as Article I of the Constitution evinces a clear textual allocation to the legislative branch, Article II likewise provides allocation of foreign relations . . . to the President, the unitary chief executive.").[4] While not "every case or controversy which touches foreign relations lies beyond judicial cognizance," *Baker*, 369 U.S. at 211, it is also true that "[m]atters intimately related to foreign policy . . . are rarely proper subjects for judicial intervention," *Haig v. Agee*, 453 U.S. 280, 292 (1981). *See also generally* Wright & Miller, Federal Practice & Procedure §

---

[4] *See also* U.S. Const. art II, § 2 (President is Commander in Chief); 14 U.S.C. § 101 (Coast Guard is a branch of the military); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414, 429 (2003) (President bears the "vast share of responsibility for the conduct of our foreign relations" and thus holds "independent authority in the area[] of foreign policy" (quotation marks omitted)); *United States v. Stanley*, 483 U.S. 669, 682 (1987) (noting that the Constitution grants authority over the military to the political branches).

3534.2 (3d ed. 1998) ("Matters dealing with foreign affairs constitute one of the areas in which courts regularly recognize a very broad latitude in the political branches.").

The Supreme Court has "recognized that the President has authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress." *Garamendi*, 539 U.S. at 415. Here, the Executive Branch entered a bilateral agreement with a foreign nation to ensure their cooperation in countering international drug trafficking, which "constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 14,059, 86 Fed. Reg. 71549 (Dec. 15, 2021). In so doing, the Executive Branch was exercising a power constitutionally assigned to it "since the early years of the Republic." *Garamendi*, 539 U.S. at 415. As such, there can be no doubt that the Coast Guard and State Department's commitment to its bilateral obligations is an action that is constitutionally committed to the Executive Branch. *See Baker*, 369 U.S. at 217.

Second, there is a "lack of judicially discoverable and manageable standards for resolving" whether the Coast Guard should have put Plaintiff ashore sooner. *See id.* The United States began the procedure to comply with its international and bilateral obligations the day Plaintiff's vessel was interdicted, and then put Plaintiff ashore the same day the Coast Guard received the United Kingdom's concurrence with the BVI's decision to waive its jurisdiction to prosecute Plaintiff. *See* CDR Starr Decl. ¶¶ 8a-k.

Second-guessing those actions is unworkable. To decide whether the Coast

11

Guard should have done something differently to ensure Plaintiff spent less than 36 days at sea, the Court would have to determine whether the United States Government should have done one of the following: (1) ignored its international and bilateral obligations to the U.K. and put Plaintiff ashore without the foreign country's waiver of jurisdiction; (2) decided that the British considered the BVI's waiver of jurisdiction on July 14 sufficient to waive the United Kingdom's jurisdiction; or (3) pressed the U.K. for a final decision sooner than July 22.

Each of these options lacks any judicially manageable standard under tort law. First, foregoing entirely the Government's bilateral obligations under the 1998 U.S.—U.K. Agreement would damage the United States' diplomatic relations with the United Kingdom and significantly risk, if not eliminate, the Government's ability to prosecute Plaintiff for failure to comply with the jurisdictional requirements of the MDLEA. 46 U.S.C. § 70502(c)(2) (jurisdiction by consent of foreign sovereign). Tort law does not furnish the Court with a standard to assess how much diplomatic damage is acceptable. Nor does it give the Court guidance to determine when the Government should forego a criminal prosecution to avoid a potential civil suit.

Second, there are no judicially manageable standards by which to assess whether the Government should have taken the BVI's waiver of jurisdiction on July 14 as the U.K.'s waiver of jurisdiction to prosecute. While Commander Starr "was informed that the British Virgin Islands had agreed to waive jurisdiction to prosecute Jerome Nibbs," he was also informed that "this decision would be followed by a formal diplomatic note." CDR Starr Decl. ¶ 8e. As Commander Starr attested, neither he

nor his chain of command were sure if this waiver was sufficient. *See id.* ¶ 8f. While the United States (or perhaps the Court) could come to its own conclusions about whether it viewed the BVI's waiver as sufficient, neither the Coast Guard nor the Court may speak for how the United Kingdom viewed this waiver by its overseas territory. That was an issue solely for the United Kingdom to decide in light of London's relationship to Tortola. Upon receipt of London's concurrence on July 22, the United States concluded that it could put Plaintiff ashore without a formal diplomatic note. *See id.* ¶ 8j. Acting sooner would have risked intruding into the London—Tortola relationship and thus risked damaging our foreign relations with the United Kingdom.

Finally, there are no judicially manageable standards to decide whether the Coast Guard should have pressed the U.K. more firmly for a final decision sooner than July 22. Commander Starr attests that before the initial waiver of jurisdiction by BVI on July 14, he "engaged in multiple attempts to obtain the waiver of jurisdiction," *see id.* ¶ 8d, and between July 14 and July 22 he worked with components of the U.S. Government as well as the BVI and the United Kingdom to obtain the "essential clarification" whether the July 14 waiver was sufficient. *See id.* ¶ 8g.

To determine that Commander Starr did not press the British hard enough would require knowledge of the then-current bilateral relationship on drug interdiction, knowledge of the personal relationships involved, knowledge of the power dynamic between the U.K. and its overseas territory, and the like. Unlike

Commander Starr, who was the State Department's delegated authority to engage in this diplomacy, "courts are unschooled in 'the delicacies of diplomatic negotiation [and] the inevitable bargaining for the best solution of an international'" dispute. *Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997) (quoting *Smith v. Reagan*, 844 F.2d 195, 199 (4th Cir. 1988) (alterations in original); *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) ("[C]ourts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy.").

For these reasons, there are no judicially manageable standards to assess the reasonableness of the duration of Plaintiff's detention aboard the Coast Guard cutters.

## II. Four Prudential *Baker* Factors

The last four of the *Baker* factors are known as "the prudential factors" and are "closely related" because they are "animated by the same principle:  as a prudential matter, the Judiciary should be hesitant to conflict with the other two branches." *Al-Tamini v. Adelson*, 916 F.3d 1, 12 (D.C. Cir. 2019).[5]  Again, these factors are:

---

[5] In its recent pronouncements on the political question doctrine, the Supreme Court did not discuss the prudential factors. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).  But, given that the Supreme Court "does not normally overturn, or . . . dramatically limit, earlier authority *sub silentio*" we cannot be certain that these prudential factors have been eliminated from the political doctrine inquiry. *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 3 (2000).  Lower courts continue to apply them. *See, e.g.*, *Al-Tamini*, 916 F.3d at 12-13.

14

> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.

Here, the prudential factors counsel against judicial pronouncements on the duration of Plaintiff's detention.  Plaintiff was held aboard Coast Guard cutters for 36 days to ensure the Coast Guard complied with its bilateral obligations under the 1998 U.S.—U.K. Agreement and with its jurisdictional obligations under the MDLEA.  *See* CDR Starr Decl. ¶¶ 8a-k.

A tort action based on second-guessing the duration of that seaboard detention would involve delving into diplomatic details that Congress has foreclosed in criminal prosecutions, 46 U.S.C. § 70502(c)(2) (certification proves jurisdiction conclusively).[6] It would also not give due respect to the Executive Branch, which had already made a discretionary policy choice in the realm of foreign relations to seek the waiver of jurisdiction.  Finally, it could cause embarrassment to the Executive Branch and the United Kingdom through a judicial pronouncement that the United Kingdom should have waived its jurisdiction sooner.

---

[6] *See also United States v. Cardales-Luna*, 632 F.3d 731, 737 (1st Cir. 2011) (certification of waiver of jurisdiction under MDLEA is conclusive and any question about its legitimacy is a question of international law to be raised by the foreign nation); *United States v. Gil-Martinez*, 980 F. Supp. 2d 165, 169 (D.P.R. 2013) (same).

15

### III.    Persuasive Precedent in an Analogous Case

In *Weir v. United States*, 518 F. Supp. 3d 1 (D.D.C. 2021), the District Court for the District of Columbia, on essentially the same facts, ruled that the political question doctrine precluded it from second-guessing the duration of drug smugglers' detention aboard Coast Guard vessels to the extent that the detention was due to the Executive Branch's compliance with its bilateral agreement with a foreign nation. *See Weir*, 518 F. Supp. 3d at 15.

Like Plaintiff here, the four detainees in *Weir* were interdicted on suspicion of drug smuggling in the Caribbean.  *See id.* at 5.  They were detained for 32 days aboard Coast Guard vessels.  *See id.* at 6.  For most of that time, the United States was trying to obtain a waiver of jurisdiction from Jamaica pursuant to a bilateral agreement between the two countries. *See id.* at 12.  Like Plaintiff, the four detainees subsequently sought civil damages for the duration and conditions of their confinement.  *See id.* at 7, 11.

Unlike in *Weir*, the United States is seeking to dismiss Plaintiff's tort claim only to the extent that he challenges the duration of his detention aboard Coast Guard vessels.[7]  During the 36 days Plaintiff was detained aboard these vessels, the United

---

[7] In comparison, in *Weir*, the United States moved to dismiss on the grounds that all claims—based on conditions of confinement and duration of detention—were nonjusticiable political questions.  *See Weir*, 518 F. Supp. 3d at 4.  Also, in *Weir*, plaintiffs pled counts seeking tort relief because the Coast Guard did not permit them to contact their families while they were detained aboard the vessels.  *See id.* at 18.  Plaintiff has not done so here in his First Amended Complaint.  While he testified at his deposition that the Coast Guard did not permit him such contact with his family, *see, e.g.*, Ex. 4, Pl.'s Dep. 41:13–23, such allegations are subject to dismissal under the political question doctrine.  *See Weir*, 518 F. Supp. 3d at 18-19

16

States was trying to obtain the United Kingdom's waiver of jurisdiction. *See* CDR Starr ¶¶ 8a-k. The *Weir* court found that "the issue of whether the [Coast Guard] should have brought the plaintiffs to the United States before Jamaica waived jurisdiction presents the Court with a political question." *Weir*, 518 F. Supp. 3d at 15.

After reviewing the material terms of the bilateral agreement, the *Weir* court concluded that it "is not for the Court to second-guess whether the Executive should have complied with its treaty obligations, or its decisions about what actions related to Jamaican nationals would offend Jamaica or upset diplomatic relations." *Id.* As a result, the court concluded that the political question doctrine deprived the court of jurisdiction to hear tort-based allegations based on being detained aboard Coast Guard vessels while a foreign nation considered weighing waiving its jurisdiction. *See id.* at 15, 19.[8]

This Court should do the same. Plaintiff "has no judicial remedy for his claims involving foreign relations and his place in the conduct of such relations," *Eveland v.*

---

(holding that such a "line of inquiry would improperly involve the Court in questioning the Executive's diplomatic decision-making" because the claims could not be adjudicated without asking how the foreign nation responded to the news that its nationals were being detained and "determining whether the Coast Guard made the appropriate decisions in light of the foreign nation's response").

[8] In *Weir* the court drew a distinction between the duration of detention while the Coast Guard sought to obtain the waiver of jurisdiction (25 days) and the full length of detention (32 days) because the political question precluded a challenge to the former but not the latter. *See Weir*, 518 F. Supp. 3d at 15-16 & n.4. This is not an issue here, however. In this case, the Coast Guard began the consultation process the day it interdicted Plaintiff's drug boat and concluded the bilateral process the day the Coast Guard put him ashore. *See* CDR Starr Decl. ¶¶ 8a-k.

17

*Director of CIA,* 843 F.2d 46, 49 (1st Cir. 1988), when these negligence allegations are grounded in the duration of his detention aboard Coast Guard vessels.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that the Court dismiss the allegations in Plaintiff's First Amended Complaint pertaining to the duration of his detention aboard a series of Coast Guard cutters in June and July of 2022.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

W. STEPHEN MULDROW
United States Attorney
District of Puerto Rico

RODNEY PATTON
Director

*/s/ Gavin J. Hallisey*
GAVIN J. HALLISEY
Puerto Rico Gov Attorney Bar No. G04117
LAINE M. GOODHUE
Puerto Rico Gov Attorney Bar No. G04102
Trial Attorneys
Aviation, Space & Admiralty Litigation
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 14271
Washington, DC 20044-4271
(202) 307-1030
Rodney.Patton@usdoj.gov

18

DENNISE N. LONGO QUIÑONES
Assistant U.S. Attorney
USDC-PR 211408
Torre Chardón, Suite 1201
350 Carlos Chardón St.
San Juan, Puerto Rico 00918
(787) 282-1928
Dennise.longo.quinones@usdoj.gov

*Attorneys for Defendant United States of America*

19