**Exhibit 1 –
The 1998 U.S.—U.K. Agreement**

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 00-1030

# MARITIME MATTERS

## Shiprider in the Caribbean and Bermuda

Agreement Between the

**UNITED STATES OF AMERICA**

and the **UNITED KINGDOM OF**

**GREAT BRITAIN AND NORTHERN IRELAND**

Signed at Washington July 13, 1998



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

**UNITED KINGDOM OF GREAT BRITAIN
AND NORTHERN IRELAND**

**Maritime Matters:  Shiprider in the Caribbean
and Bermuda**

*Agreement signed at Washington July 13, 1998;
Entered into force October 30, 2000.*

**AGREEMENT
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND
NORTHERN IRELAND
CONCERNING MARITIME AND AERIAL OPERATIONS
TO SUPPRESS ILLICIT TRAFFICKING BY SEA
IN WATERS OF THE CARIBBEAN AND BERMUDA**

The Government of the United States of America and the Government of the United

Kingdom of Great Britain and Northern Ireland, on its own behalf and on behalf of the

Governments of Anguilla, Bermuda, the British Virgin Islands, the Cayman Islands,

Montserrat, and the Turks and Caicos Islands, (hereinafter, the "Parties");

Bearing in mind the complex nature of the problem of illicit trafficking by sea;

Having regard to the urgent need for international cooperation in suppressing illicit

trafficking by sea, which is recognized in the 1961 Single Convention on Narcotic Drugs and

its 1972 Protocol, in the 1971 Convention on Psychotropic Substances, in the 1982 United Nations Convention on the Law of the Sea, and in the 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (hereinafter, the "1988 Convention");

Recalling the Agreement between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland to facilitate the interdiction by the United States of vessels of the United Kingdom suspected of trafficking in drugs, effected by an Exchange of Notes at London, November 13, 1981 (hereinafter, the "1981 Agreement");

Recalling also the Memorandum of Understanding between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, on behalf of the Government of the British Virgin Islands, concerning maritime narcotics interdiction operations, signed in Tortola, February 6, 1990, as extended to the United States Customs Service by Exchange of Notes dated December 2 and 10, 1992 (hereinafter, the "1990 MOU");

Further recalling the Memorandum of Understanding between the Government of the United States of America, the Government of the United Kingdom of Great Britain and Northern Ireland, including the Government of the Turks and Caicos Islands, and the Government of the Bahamas, signed in Washington, July 12, 1990 (hereinafter, "the 1990 TRIPART MOU"); and

Desiring to promote greater cooperation between the Parties in combatting illicit trafficking by sea in the waters of the Caribbean and Bermuda;

Have agreed as follows:

## Article 1
### Nature and Scope of Agreement

The Parties shall continue to cooperate in combatting illicit trafficking by sea to the fullest extent possible, consistent with available law enforcement resources and priorities related thereto.

## Article 2
### Definitions

In this Agreement, unless the context otherwise requires:

1. "Illicit traffic" has the same meaning as in Article 1(m) of the 1988 Convention.

2. "Territory, waters and airspace of the Parties" means:

   (i) For the Government of the United Kingdom of Great Britain and Northern Ireland: United Kingdom Overseas Territories (UKOT) territory, waters and airspace, comprised of the territory, territorial sea and internal waters of Anguilla, Bermuda, the British Virgin Islands, the Cayman Islands, Montserrat, and the Turks and Caicos Islands, and the air space over such territory and waters.

   (ii) For the Government of the United States of America: the territory, territorial sea and internal waters of Puerto Rico, the United States Virgin Islands, Navassa Island and other territories and possessions in the Caribbean sea over which the United States exercises sovereignty, and the air space over such territory and waters.

3. "Law enforcement vessels" means warships and other ships of the Parties, clearly marked and identifiable as being on government non-commercial service and authorised to that effect, including any boat and aircraft embarked on such ships, aboard which law enforcement officials are embarked.

4. "Law enforcement aircraft" means aircraft of the Parties engaged in law enforcement operations or operations in support of law enforcement activities clearly marked and identifiable as being on government non-commercial service and authorised to that effect.

5. "Law enforcement authorities" means:

(i)  For the Government of the United Kingdom of Great Britain and Northern Ireland:  the Royal Anguillan Police and HM Customs of Anguilla, the Bermuda Police Force, the Royal Virgin Islands Police Force and HM Customs of the Virgin Islands, the Royal Cayman Islands Police and HM Customs of the Cayman Islands, the Royal Montserrat Police and HM Customs of Montserrat, and the Royal Turks and Caicos Police and HM Customs of Turks and Caicos, for the respective areas for which they have competence.

(ii)  For the Government of the United States of America:  the United States Coast Guard and the United States Customs Service.

6. "Law enforcement officials" means:

(i)  For the Government of the United Kingdom of Great Britain and Northern Ireland:  authorised members of the Royal Anguillan Police and HM Customs of Anguilla, the Bermuda Police Force, the Royal Virgin Islands Police Force and HM Customs of the Virgin Islands, the Royal Cayman Islands Police and HM Customs of the Cayman Islands, the Royal Montserrat Police and HM Customs of Montserrat, and the Royal Turks and Caicos Police and HM Customs of Turks and Caicos, for the respective areas for which they have competence.

(ii)  For the Government of the United States of America:  uniformed members of the United States Coast Guard and authorised members of the United States Customs Service.

7. "UKOT law" means, where appropriate, the laws of Anguilla, Bermuda, the British Virgin Islands, the Cayman Islands, Montserrat, and the Turks and Caicos Islands.

8. "Shiprider" means a law enforcement official of one Party authorised to embark on a law enforcement vessel of the other Party.

9. "Suspect vessel or aircraft" means a vessel or aircraft used for commercial or private purposes in respect of which there are reasonable grounds to suspect it is engaged in illicit traffic.

### Article 3
### Operations in and over National Waters

Operations to suppress illicit traffic in and over the waters of each Party are the responsibility of, and subject to the authority of, that Party.

### Article 4
### Shiprider Programme

1. The Parties shall establish a joint law enforcement shiprider programme between their respective law enforcement authorities. Each Party may designate a coordinator or coordinators to organize its programme activities and to identify the vessels and officials involved in the programme to the other Party.

2. Each UKOT may designate qualified officials of each of its law enforcement authorities to act as shipriders. Subject to applicable UKOT law, each shiprider may, in appropriate circumstances:

> (i)  embark on U.S. law enforcement vessels;

> (ii)  authorise pursuit, into UKOT waters for which the shiprider has competence, by the U.S. law enforcement vessels on which they are embarked, of suspect vessels and aircraft fleeing into or over such UKOT waters;

> (iii)  authorise the U.S. law enforcement vessels on which they are embarked to conduct patrols in UKOT waters for which the shiprider has competence under this Agreement;

> (iv)  enforce applicable UKOT law in UKOT waters for which the shiprider has competence, or seaward therefrom in the exercise of the right of hot pursuit or otherwise in accordance with international law; and

> (v)  authorise the U.S. law enforcement vessels on which they are embarked to assist in the enforcement of UKOT law for which the shiprider has competence.

3. The United States of America may designate qualified officials of its law enforcement authority to act as shipriders. Subject to applicable U.S. law, each shiprider may, in appropriate circumstances:

(i) embark on UKOT and UK law enforcement vessels;

(ii) authorise pursuit into U.S. waters, by the UKOT and UK law enforcement vessels on which they are embarked, of suspect vessels and aircraft fleeing into or over U.S. waters;

(iii) authorise the UKOT and UK law enforcement vessels on which they are embarked to conduct patrols in U.S. waters under this Agreement;

(iv) enforce the laws of the United States in U.S. waters, or seaward therefrom, in the exercise of the right of hot pursuit or otherwise in accordance with international law; and

(v) authorise the UKOT and UK law enforcement vessels on which they are embarked to assist in the enforcement of U.S. law.

### Article 5
### Authority of Law Enforcement Officials

When a shiprider of one Party is embarked on the other Party's vessel, and the enforcement action being carried out is pursuant to the shiprider's authority, any search or seizure of property, any detention of a person, and any use of force pursuant to this Agreement, whether or not involving weapons, shall be carried out by the shiprider, except as follows:

(i) crew members of the other Party's vessel may assist in any such action if expressly requested to do so by the shiprider and only to the extent and in the manner requested. Such request may only be made, agreed to, and acted upon in accordance with the applicable laws and policies of both Parties; and

(ii) such crew members may use force in self-defence, in accordance with the applicable laws and policies of their Government.

### Article 6
### Operations in National Waters

1. Neither Party shall conduct operations to suppress illicit traffic in or over the territory or waters of the other Party without the permission of the other Party, as provided by this Agreement or otherwise agreed to by the Parties. This Agreement constitutes permission

by each Party for the other Party to conduct operations to suppress illicit traffic in any of the following circumstances:

(i) an embarked shiprider of the other Party so authorises;

(ii) a suspect vessel or aircraft, encountered by one Party ("the first Party") flees into the waters or airspace of the other Party and, if no law enforcement vessel of the other Party is immediately available to investigate, the law enforcement vessel of the first Party without a shiprider of the other Party embarked may pursue the suspect vessel or aircraft into the waters or airspace of the other Party, in which case the suspect vessel may be boarded and searched, and, if the evidence warrants, detained pending instructions from the law enforcement authority of the other Party as to the exercise of jurisdiction in accordance with Article 10 of this Agreement; or

(iii) a shiprider of the other Party is not embarked on a law enforcement vessel of the first Party, and no law enforcement vessel or official of the other Party is immediately available to investigate, in which case the law enforcement vessel or aircraft of the first Party may enter the waters or airspace of the other Party in order to investigate any suspect aircraft or board and search any suspect vessel located therein, other than a vessel flying the flag of the other Party. If the evidence warrants, law enforcement officials of the first Party may detain the suspect vessel and persons on board pending instructions from the law enforcement authority of the other Party as to the exercise of jurisdiction in accordance with Article 10 of this Agreement.

2. The law enforcement authority of each Party shall provide prior notice to the law enforcement authority of the other the Party of action to be taken under subparagraphs (ii) and (iii) of this Article, unless not operationally feasible to do so. In any case, notice of the action shall be provided to the law enforcement authority of the other Party without delay.

### Article 7
### Overflight Operations for Suppression of Illicit Traffic

Each Party agrees to permit law enforcement aircraft operated by the other Party under this Agreement:

(i) subject to Article 8 of this Agreement, to overfly its territory and waters with due regard for its laws and regulations for the flight and manoeuvre of aircraft; and

(ii) subject to the laws of each Party, to relay orders from its competent authorities to aircraft suspected of trafficking in illegal drugs to land in the territory overflown.

### Article 8
### Overflight Procedures

Each Party shall, in the interest of flight safety, observe the following procedures for facilitating flights within the airspace of one Party by law enforcement aircraft of the other Party:

(i) In the event of planned bilateral or multilateral law enforcement operations, each Party shall provide reasonable notice and communications channels to the appropriate aviation authorities responsible for air traffic control in respect of the other Party of planned flights by its aircraft over territory or waters of the other Party.

(ii) In the event of unplanned operations, which may include the pursuit of suspect aircraft into the airspace of the Parties pursuant to this Agreement, the law enforcement and appropriate aviation authorities shall exchange information concerning the appropriate communications channels and other information pertinent to flight safety.

(iii) Any law enforcement aircraft operating in accordance with this Agreement shall comply with such air navigation and flight safety directions as may be required by the aviation authorities in whose airspace such aircraft is operating, and with any written operating procedures developed for flight operations within its airspace under this Agreement.

### Article 9
### Operations Seaward of the Territorial Sea

1. With regard to suspect vessels claiming registry in or the right to fly the flag of a UKOT or of the United States, as the case may be, in those circumstances to which the 1981 Agreement does not apply, whenever the law enforcement officials of one Party (the "first

Party") encounter such a vessel located seaward of any State's territorial sea, the first Party may request, in accordance with Articles 11 and 12 of this Agreement, the other Party to:

    (i) confirm the claim of registry in or the right to fly the flag of the other Party; and

    (ii) if such claim is confirmed:

        (a) to authorise the boarding and search of the suspect vessel, cargo and the persons found on board by the law enforcement officials of the first Party; and

        (b) if evidence of illicit traffic is found, for permission for the law enforcement officials to detain the vessel, cargo and persons on board pending instructions from the law enforcement authorities of the other Party as to the exercise of jurisdiction in accordance with Article 10 of this Agreement.

2. Except as expressly provided herein, this Agreement does not apply to or limit boardings of vessels, conducted by the law enforcement officials of either Party, seaward of any nation's territorial sea in accordance with international law.

### Article 10
### Jurisdiction over Detained Vessels

1. In all cases arising in UKOT territory, waters, or airspace, or concerning vessels registered in or flying the flag of a UKOT seaward of any State's territorial sea to which the 1981 Agreement does not apply, the UKOT shall have the primary right to exercise jurisdiction over a detained vessel, cargo and/or persons on board (including seizure, arrest, prosecution and forfeiture), provided, however, that the UKOT may, subject to its law, waive its primary right to exercise jurisdiction and authorise the enforcement of U.S. law against the vessel, cargo and/or persons on board.

2. In all cases arising in U.S. territory, waters, or airspace, or concerning vessels registered in or flying the flag of the United States seaward of any State's territorial sea, the United States of America shall have the primary right to exercise jurisdiction over a detained

vessel, cargo and/or persons on board (including seizure, arrest, prosecution and forfeiture), provided, however, that the United States may, subject to its law, waive its primary right to exercise jurisdiction and authorise the enforcement of UKOT law against the vessel, cargo and/or persons on board.

3. Instructions as to the exercise of jurisdiction pursuant to this Article shall be given without delay.

### Article 11
### Points of Contact

Each Party shall provide the other Party, and keep current, the points of contact for notifications under Article 6, for processing requests under Article 9 for verification of registration and the right to fly its flag and authority to board, search and detain suspect vessels, and for instructions as to the exercise of jurisdiction under Article 10.

### Article 12
### Content of Requests

1. Each request should contain, if possible, the name of the vessel, basis for suspicion, registration number, homeport, and any other identifying information.

2. If a request is conveyed orally, it shall later be confirmed in writing.

### Article 13
### Responses to Requests

1. Requests by a Party for verification of registration or the right to fly the flag of the other Party and for permission to board and search shall be answered by the other Party within two (2) hours from receipt of the request.

2. If the registration or the right to fly its flag is verified, the requested Party may:

    (i)  decide to conduct the boarding and search with its own law enforcement officials;

    (ii)  authorise the boarding and search by the law enforcement officials of the requesting Party;

(iii)  decide to conduct the boarding and search together with the requesting Party; or

(iv)  deny permission to board and search.

3.  If the registration or the right to fly its flag is not verified within the two (2) hours, the requested Party may:

(i)  nevertheless authorise the boarding and search by the law enforcement officials of the requesting Party; or

(ii)  refute the claim of the suspect vessel to registration or the right to fly its flag under its laws.

4.  If there is no response from the requested Party within two (2) hours of its receipt of the request, the requesting Party will be deemed to have been authorised to board the suspect vessel for the purpose of inspecting the vessel's documents, questioning the persons on board, and searching the vessel to determine if it is engaged in illicit traffic.

5.  The authorization to board, search and detain includes the authority to use force in accordance with Article 17 of this Agreement.

### Article 14
### Cases of Suspect Vessels and Aircraft

Operations to suppress illicit traffic pursuant to this Agreement shall be carried out only against suspect vessels and aircraft, including vessels and aircraft without nationality or vessels assimilated to a vessel without nationality.

### Article 15
### Notification of Results of Shipboardings

Each Party shall promptly notify the other Party of the results of any boarding and search of the vessels of the other Party conducted pursuant to this Agreement.

### Article 16
### Conduct of Law Enforcement Officials

1.  Each Party shall ensure that its law enforcement officials, when conducting boardings and searches and air interception activities pursuant to this Agreement, act in

accordance with its applicable national laws and policies and with international law and accepted international practices.

2. Boardings and searches of vessels pursuant to this Agreement shall only be carried out by law enforcement officials from law enforcement vessels. Boarding and search teams may carry standard law enforcement weapons.

3. The boarding and search teams may also operate pursuant to this Agreement seaward of the territorial sea of any State, from vessels and aircraft of other States, including any boat or aircraft embarked on vessels, clearly marked and identifiable as being on government non-commercial service and authorised to that effect, as may be agreed to in writing by the Parties.

4. While conducting air intercept activities pursuant to this Agreement, the Parties shall not endanger the lives of persons on board and the safety of civil aircraft.

### Article 17
### Use of Force

1. All uses of force by a Party pursuant to this Agreement shall be in strict accordance with applicable laws and policies of that Party and shall in all cases be the minimum reasonably necessary under the circumstances, except that neither Party shall use force against civil aircraft in flight.

2. Nothing in this Agreement shall impair the exercise of the inherent right of self-defence by law enforcement or other officials of the Parties.

### Article 18
### Exchange and Knowledge of Laws and Policies of Other Party

1. To facilitate implementation of this Agreement, each Party shall ensure that the other Party is fully informed of its respective applicable laws and policies, particularly those pertaining to the use of force.

2. Each Party shall ensure that all of its law enforcement officials are knowledgeable concerning the applicable laws and policies of both Parties.

## Article 19
## Disposition of Seized Property

1. Assets seized in consequence of any operation undertaken pursuant to this Agreement shall be disposed of in accordance with the laws of that Party exercising jurisdiction in accordance with Article 10 of this Agreement.

2. To the extent permitted by its laws and upon such terms as it deems appropriate, the seizing Party may, in any case, transfer forfeited assets or proceeds of their sale to the other Party. Each transfer generally will reflect the contribution of the other Party to facilitating or effecting the forfeiture of such assets or proceeds.

## Article 20
## Technical Assistance

The law enforcement authority of one Party (the "first Party") may request, and the law enforcement authority of the other Party may authorise, law enforcement officials of the other Party to provide technical assistance to law enforcement officials of the first Party for the boarding and search of suspect vessels located in the territory or waters of the first Party.

## Article 21
## Consultations

In case a question arises in connection with implementation of this Agreement, either Party may request consultations between the Parties to resolve the matter.

## Article 22
## Settlement of Claims

Responsibility for meeting any successful claim for damage, injury or loss resulting from an operation carried out under this Agreement shall rest with the Party whose law enforcement officials conducted the operation. In the event of a successful claim being made against the other Party in respect of such operation, that Party may seek compensation from the Party whose law enforcement officials conducted the operation.

### Article 23
### Miscellaneous Provisions

Nothing in this Agreement:

(i)  precludes each Party from otherwise expressly authorizing operations to suppress illicit traffic by the other Party in the territory, waters or airspace of the first Party, or involving suspect vessels or aircraft flying or displaying the flag of the first Party, or from providing other forms of cooperation to suppress illicit traffic;

(ii)  is intended to alter the rights and privileges due any individual in any legal proceeding;

(iii)  is intended to modify, replace or affect in any way the provisions of the 1981 Agreement or the 1990 TRIPART MOU.

### Article 24
### Entry into Force and Duration

1.  This Agreement shall enter into force upon exchange of notes indicating that the necessary internal procedures of each Party have been completed.

2.  Upon entry into force of this Agreement, this Agreement supersedes and replaces the 1990 MOU.

### Article 25
### Termination

1.  This Agreement may be terminated at any time by either Party upon written notification to the other Party through the diplomatic channel.

2.  Such termination shall take effect six months from the date of notification.

### Article 26
### Continuation of Actions Taken

This Agreement shall continue to apply after termination with respect to any administrative or judicial proceedings arising out of actions taken pursuant to this Agreement.

**IN WITNESS WHEREOF**, the undersigned, being duly authorised by their respective Governments, have signed this Agreement.

**DONE AT** Washington, in duplicate, this thirteenth day of July, 1998.

**FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:**

*Wendy R. Sherman*

**FOR THE GOVERNMENT OF THE
UNITED KINGDOM OF GREAT BRITAIN
AND NORTHERN IRELAND:**

*Symons of Vernham Dean*