**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **JEROME NIBBS,**<br><br>***Plaintiff,***<br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>***Defendant.*** | Case No. 24-cv-01290 (MAJ) |

**OPINION AND ORDER**

## I. Introduction

In the summer of 2022, Plaintiff Jerome Nibbs ("Nibbs") was apprehended by the United States Coast Guard ("Coast Guard") on the high seas off the coast of the United States Virgin Islands from a vessel suspected of drug trafficking that was observed jettisoning thirty packages overboard upon the Coast Guard's approach. Three of these packages were ultimately recovered and found to contain approximately ninety kilograms of cocaine. Over the next thirty-six days, Nibbs was transferred between multiple Coast Guard cutters as the Coast Guard awaited diplomatic clearance to put Nibbs ashore. Nibbs filed the instant action alleging that the Coast Guard negligently caused him damages in the form of "emotional, moral anguish and psychiatric conditions" through their treatment of him at sea. (**ECF Nos. 3, 14**). Defendant United States of America (the "Government") moves to dismiss based on lack of subject matter jurisdiction under the political question and discretionary function doctrines and moves for summary judgment on Nibbs's sole claim of negligent infliction of emotional distress ("NIED"). (**ECF Nos. 58–60**).

## II. Factual Background

The Court begins by briefly setting forth the facts as alleged in the Amended Complaint. (**ECF No. 14**). Because the Government makes a factual, rather than facial, challenge to the Court's jurisdiction, the Court need not take all the facts in the Amended Complaint as true at this juncture and may consider facts asserted by the Defendant. *See Mercado Arocho v. United States*, 455 F. Supp. 2d 15, 18 (D.P.R. 2006).

Plaintiff Jerome Nibbs is a citizen of the United Kingdom. (**ECF No. 14 ¶ 4.1**). On June 16, 2022, the Coast Guard detected a maritime target of interest approximately 25 nautical miles from Saint Thomas, United States Virgin Islands. (**ECF No. 14 ¶ 6**). The Coast Guard suspected the vessel of drug smuggling, and the cutter HERIBERTO HERNANDEZ was diverted and ordered to intercept the vessel. (**ECF No. 14 ¶ 7**). Coast Guard personnel observed the non-compliant target jettison approximately thirty packages before becoming dead in the water and complying with Coast Guard directions. *Id.* Three of these packages were recovered and later confirmed to contain approximately ninety kilograms of cocaine. (**ECF No. 14 ¶ 9**). The Coast Guard arrested three individuals on board the vessel, including Nibbs. (**ECF No. 14 ¶ 8**). The master of the vessel made a claim of British Virgin Islands nationality for himself and for the vessel. *Id.*

Because of his British Virgin Islands nationality, international agreements between the United States and the United Kingdom dictated that Nibbs could not be prosecuted without a waiver from the British government. (**ECF No. 58-2 ¶ 6**). On June 16 or 17, the Coast Guard began the process of seeking a waiver of jurisdiction by the British government that would enable the Coast Guard to put Nibbs ashore on United States territory and prosecute him. (**ECF No. 14 ¶ 11**); (**ECF No. 58-2 ¶ 8**). Between June 19 and July 14, 2026, Commander Ian M. Starr of the Coast Guard, who was detailed to the

United States Department of State's Bureau of International Narcotics and Law Enforcement Affairs, engaged in efforts to obtain the waiver of jurisdiction. (**ECF No. 58-2 ¶ 8**). On July 14, Commander Starr was informed that the British Virgin Islands had agreed to waive jurisdiction to prosecute Nibbs and that the decision would be followed by a formal diplomatic note. *Id.* However, Commander Starr and his chain of command were unclear as to whether this waiver from the British Virgin Islands was sufficient under applicable diplomatic agreements. *Id.* Accordingly, Commander Starr continued to seek clarification from the government of the United Kingdom in London until they confirmed their concurrence with the waiver of jurisdiction on July 22, 2022. *Id.* Nibbs was put ashore in Puerto Rico and presented before a magistrate judge the same day. (**ECF No. 14 ¶ 22**).

Because the Coast Guard was of the understanding that Nibbs could not be put ashore absent waiver from the United Kingdom government, Nibbs was detained at sea aboard various Coast Guard cutters between June 17 and July 22, 2026. (**ECF No. 14 ¶¶ 10–22**). During that time, he was transferred between cutters a total of ten times. *Id.* Nibbs alleges that he was subjected to the following inhumane conditions during his detention aboard the various cutters:

> (A) Chained to the on deck of multiple US Coast Guard Cutters, exposed to the elements of rain, saltwater spray, and sun for weeks non-stop. At times when raining Plaintiff had to stand so the rainwater could run off, so his location could be free of water[;]
>
> (B) Minimal food and water;
>
> (C) Hosed down like a dog;
>
> (D) Ordered to defecate in presence of children while naked and urinate in the same manner in front of minor children both male and female;
>
> (E) Handcuffed and chained out in the rain with no available cover;

> (F) Was not provided bottled water and was given water drawn from the same utility hose he was hosed down with (bathing water), that the ensigns used to fill the cooler, (without any ice). Plaintiff complaint about the taste of the water, and no action was taken.

(**ECF No. 14 ¶ 23**). Nibbs additionally "inferred racism was [an] integral part of this tortuous[,] inhumane treatment conditions" because other prisoners were not treated in the same manner. (**ECF No. 14 ¶ 24**). In support of this belief, he points to an incident in which a white man who was rescued by the Coast Guard at sea was given at least nine cases of Vienna sausages. *Id*. Plaintiff subsequently brought the instant action against the Government.

## III. Motions to Dismiss for Lack of Subject Matter Jurisdiction

Before the Court are three motions filed by the Government, all on December 31, 2025. The first of these motions is a "Motion for Partial Dismissal of Plaintiff's Amended Complaint" for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. (**ECF No. 58**). This motion argues that, insofar as Nibbs claims that the Coast Guard was negligent in keeping him at sea for over thirty days, such arguments are barred by political question doctrine since the Coast Guard refrained from putting him ashore in consultation with the Department of State in furtherance of compliance with international agreements between the United States and the United Kingdom. The second is a "Second Motion and Memorandum in Support of its Motion for Partial Dismissal of Plaintiff's Amended Complaint for Lack of Subject Matter Jurisdiction." (**ECF No. 59**). This motion argues that "Plaintiff's First Amended Complaint must be dismissed for lack of subject matter jurisdiction to the extent that his negligent infliction of emotional distress claim is based on any allegation that he should have been held below deck on the Coast Guard cutters on which he was detained" because the design of Coast

Guard ships and policies regarding where prisoners are held fall within the discretionary function exception and "[t]he Court is without jurisdiction to hear any negligence-based allegations that fall within the discretionary function exception." (**ECF No. 59 at 8**). Finally, the Government's third motion—a motion for summary judgment—calls for the dismissal of the Amended Complaint based on the doctrine of issue preclusion and failure to produce evidence supporting Nibbs's claim. (**ECF No. 60**).

The Court must resolve issues of subject matter jurisdiction before it can proceed to address claims on the merits, so the Motions to Dismiss will be addressed first. *See Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017) ("The political question doctrine concerns the jurisdictional case or controversy requirement of Article III of the Constitution, and the Court must address it before proceeding to the merits.") (internal quotations and citations omitted); *Carroll v. United States*, 661 F.3d 87, 100 (1st Cir. 2011) ("If the challenged conduct is both discretionary and policy-based, there is no subject-matter jurisdiction for the claim."). The grounds argued in the Government's motions to dismiss, however, would not strip the Court of jurisdiction to hear Plaintiff's singular claim in the event they were successful. In short, the Government does not argue in its motions to dismiss that this Court lacks jurisdiction to hear Nibbs's singular claim; rather, they argue that this Court lacks jurisdiction to hear certain arguments in support of that claim. Even if this Court were to conclude (1) that it lacks jurisdiction to decide whether the Coast Guard was negligent in waiting until it received the United Kingdom's concurrence with the BVI's decision to waive jurisdiction before putting Plaintiff ashore, and (2) that the discretionary function bars allegations that Plaintiff should have been detained below deck, it would not lack subject matter jurisdiction to hear Plaintiff's complaint—the gravamen of Plaintiff's complaint is the *treatment* of Plaintiff on the deck

of the Coast Guard cutters.[1] *See* (**ECF No. 14 ¶ 30**) ("At all times material, the United States Coast Guard's clear negligence and failure to adhere to basic humane treatment of detainees caused plaintiff's emotional injuries."). Although the substantive legal grounds argued in the motions to dismiss have merit, the Court need not resolve those questions at this juncture and will deny the motions for the reasons below.

**A. Political Question Doctrine**

The Political Question Doctrine is a principle of justiciability grounded in the separation of powers, limiting the federal court's authority to decide certain matters that are committed to the other branches of government or that lack judicially manageable standards. *Baker v. Carr*, 369 U.S. 186 (1962). However, "[u]nless [a political question] is *inextricable* from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.* at 217 (emphasis added). Because the Court can easily extricate the claimed political question by considering Plaintiff's claim without deciding whether the decision to await waiver from both the government of the BVI and the United Kingdom was negligent, the justiciability of Plaintiff's claim writ large is not in dispute. *See Weir v. United States*, 518 F. Supp. 3d 1, 15–16 (D.D.C. 2021) (holding that claims including negligent infliction of emotional distress would not be dismissed where the court concluded that "the issue of whether the defendants should have brought the plaintiffs to the United States before Jamaica waived jurisdiction presents the Court with a political question" because "the Court can adjudicate the claims that challenge the length of detention by asking whether the Coast Guard detained the

---

[1] The Court notes that Plaintiff does argue that the Coast Guard was negligent in not putting him ashore earlier. *See* (**ECF No. 68**). But Plaintiff does not separate his theories of negligence into separate claims; rather, he pursues a broader claim that encompasses the negligent standard of care with which he was treated, including detaining him for an unreasonable amount of time.

plaintiffs in a lawful manner in light of the United States' obligation to wait until Jamaica waived jurisdiction under the Bilateral Agreement before bringing the defendants to the United States for prosecution."). Ultimately, because the relief requested by Plaintiff is unavailable to him, the Court need not outline the strictures of the degree to which it can consider the Coast Guard's delay in putting Plaintiff ashore. Accordingly, the Motion to Dismiss for Lack of Jurisdiction based on political question doctrine at ECF No. 58 is **DENIED**.

**B. The Discretionary Function Doctrine**

The discretionary function concerns raised by the government are even further divorced from any question as to whether the Court has jurisdiction to hear Plaintiff's claim. The discretionary function "immunizes conduct of government employees that arises from legislative and administrative decisions grounded in social, economic, and political policy, protecting against liability that would seriously handicap efficient government operations." *Carroll*, 661 F.3d at 99 (internal quotations omitted). The Government argues that the Court therefore lacks subject matter jurisdiction to hear Nibbs's claim "[t]o the extent [he] alleges that the Coast Guard should have detained him below deck instead of above deck[.]" (**ECF No. 59 at 10**). Nibbs simply responds that he "has made **no claim** that he should have been detained below deck instead of [on] the deck of each vessel[]." (**ECF No. 69 at 1**) (emphasis in original). The Court joins Nibbs in scratching its head as to how the discretionary function would therefore prevent the Court from hearing Nibbs's NIED claim. Nibbs's Amended Complaint and briefings focus on the conditions of his detention above-deck and alleged departures from Coast Guard directives regarding how individuals should be detained on deck; they do not gesture towards a theory that the Coast Guard was negligent in failing to detain him below deck

or design its ships in a way that detainees could be detained below deck. *See* (**ECF No. 69 at 2**) ("At no point in time [does] Mr. Nibbs, allege[] as inhumane condition, that he was not taken or should have been taken *below deck* in his complaint.") (emphasis in original). Because the Government's jurisdictional challenge based on the discretionary function seeks to apply the doctrine to claims that Nibbs plainly does not advance, the Motion to Dismiss at ECF No. 59 is likewise **DENIED**.

## IV. Motion for Summary Judgment

The Government's third New Year's Eve motion is a "Motion for Full or, Alternatively, Partial Summary Judgment." (**ECF No. 60**). This motion seeks to dispose of Nibbs's action on the grounds that (1) the doctrine of issue preclusion bars Nibbs from establishing breach of a duty of care because the Honorable Judge Francisco Besosa ("Judge Besosa") ruled in *United States v. Nibbs*, 22-cr-340 (FAB), that Nibbs was not mistreated nor unreasonably delayed before presentment to a magistrate judge, and (2) Nibbs's bathroom-related allegations do not satisfy the requirements of an NIED claim because the Coast Guard's conduct did not place him in the requisite "zone of danger." (**ECF No. 60 at 1–2**). Because the Court concludes that *none* of Nibbs's allegations satisfy the requirements of an NIED claim, the Motion for Summary Judgment at ECF No. 60 is **GRANTED**.[2]

[2] Because Plaintiff requests relief that is wholly unavailable to him, this decision need not address Defendant's argument that issue preclusion applies and prevents Nibbs from being able to prove a breach of a duty of care necessary to sustain a claim in negligence. The Court notes, however, that holding that issue preclusion bars Nibbs from alleging that the Coast Guard breached a duty of care would be wholly inappropriate in this case. Nibbs's Motion to Dismiss the Indictment in the criminal proceeding did not allege or discuss any of the purported mistreatment forming the basis of this action other than the length of his detention. *United States v. Nibbs*, No. 22-cr-340-FAB, Dkt. 43 (D.P.R. Nov. 14, 2022). The central conduct that forms the basis of Nibbs's Amended Complaint—the inadequacy of his food and shelter, the manner in which he used the bathroom, and the allegedly discriminatory actions of Coast Guard personnel—was not alleged in that proceeding; the Motion to Dismiss the Indictment was predicated solely on presentment delay and allegedly outrageous conduct by the Coast Guard in fomenting that delay and refusing his requests to contact the British embassy. *Id*. The Government therefore cannot meet its burden

**A. Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and only questions of law remain. *White v. Hewlett Packard Enterprise Co.*, 985 F.3d 61, 68 (1st Cir. 2021). "A genuine dispute is one that a reasonable fact-finder could resolve in favor of either party[.]" *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 7 (1st Cir. 2015). "A fact is material if it has the potential of affecting the outcome of the case[.]" *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (internal quotations and citations omitted).

"The party moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (citation omitted). In opposing a motion for summary judgment, the non-movant "bears the burden of producing specific facts sufficient to" defeat summary judgment. *González-Cabán v. JR Seafood Inc.*, 48 F.4th 10, 14 (1st Cir. 2022) (internal quotations and citations omitted). The Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003). In addition, the Court will "not engage making credibility determinations or weighing the evidence at the summary judgment stage[.]" *Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

---

of proving that the issue sought to be precluded here is the same as in the prior action, that the issue was actually litigated, that it was determined by a final judgment, and that the determination of the issue was essential to that judgment. *See Nogueras-Cartagena v. United States*, 172 F. Supp. 2d 296, 312–13 (D.P.R. 2001); *Vargas-Colón v. Fundación Damas, Inc.*, 864 F.3d 14, 26 (1st Cir. 2017).

### B. Findings of Fact

Under Local Rule 56, "[a] motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." D.P.R. Loc. Civ. R. 56(b). Similarly, "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts." D.P.R. Loc. Civ. R. 56(c). Both parties must support each asserted fact, denial, or qualification with citations to the record. D.P.R. Loc. Civ. R. 56(e). "[C]ompliance with Local Rule 56 is a mandate, not a suggestion." *Ramírez-Rivera v. DeJoy*, 693 F. Supp. 3d 210, 213 (D.P.R. 2023); *see also López-Hernández*, 64 F.4th at 26 ("We have repeatedly emphasized the importance of complying with said local rule and have implored litigants to comply or ignore it 'at their peril.'"). Accordingly, where a fact set forth by the movant has not been properly controverted, it will be deemed admitted. D.P.R. Loc. Civ. R. 56(e) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.").

The Government complied with Local Rule 56 by submitting a Statement of Material Facts properly supported by citations to the record. (**ECF No. 61**). Nibbs, however, failed to submit a response or any opposing statement of material fact. He did submit a sworn statement as Exhibit 4 to his Response in Opposition to the Government's Motion for Summary Judgment, in which he personally attests to a near-verbatim recitation of the facts alleged in his Amended Complaint without citing to the factual record. (**ECF No. 72-4**). The United States filed a Response to this exhibit moving to strike Nibbs's statement for failure to comply with Local Rule 56 and, in the event the

Court decided to credit the statement, responding to the factual assertions advanced therein with citations to the record. (**ECF No. 78**). Nibbs submitted no response to this filing.

Nibbs's sworn statement does not approach compliance with Local Rule 56.[3] As such, the Court may accept the facts asserted by the Government as undisputed. *CMI Capital Market Investment, LLC v. Gonzalez-Toro*, 520 F.3d 58, 63 (1st Cir. 2008). Nevertheless, the Court has discretion to note facts asserted by a party notwithstanding that party's failure to comply with Local Rule 56. *See Baez v. DeJoy*, 2023 WL 3766080, *2 (D.P.R. June 1, 2023) (noting that "[t]his Court has oftentimes, in its exercise of discretion, excused technical defalcations where the statements of fact are imperfectly made."). Because the Government's response provides a factual basis to credit the undisputed portions of Nibbs's sworn statement, and in the interest of resolving this dispute based on facts that are not in controversy, the Court will credit those portions of Nibbs's sworn statement that are admitted by the Government. The Court makes the below findings of undisputed fact:

The United States Coast Guard intercepted Nibbs on June 16, 2022, in the Caribbean Sea. (**ECF No. 61 ¶ 1**). The Coast Guard Cutter HERIBERTO HERNANDEZ observed a vessel, on which Nibbs was onboard, jettison approximately thirty packages before becoming dead in the water and complying with the orders of Coast Guard personnel. (**ECF No. 72-4 ¶ 1**). Three of the packages were subsequently recovered and discovered to contain approximately 90 kilograms of cocaine. (**ECF No. 72-4 at ¶ 3**). The Coast Guard detained Nibbs and two others on suspicion of drug smuggling. (**ECF**

---

[3] Nibbs's sworn statement neither addresses any of the facts asserted in the Government's Statement of Material Facts nor contains any citations to the factual record to support his assertions.

**No. 61 ¶ 2**). The master of the vessel made a claim of British Virgin Islands nationality for himself and for the vessel. (**ECF NO. 72-4 ¶ 2**).

Over 36 days, the Coast Guard detained Nibbs aboard various Coast Guard vessels. (**ECF No. 61 ¶ 3**). While on board, Nibbs was confined to the decks of the ships by ankle restraints. (**ECF No. 78 ¶ 6(c)**). Nibbs's shelter consisted of a tarp over his head with netting on either side. (**ECF No. 78 ¶ 6(d)**). Because of this, he was sometimes exposed to rain, sun, and saltwater spray if the boat was moving rapidly. *Id*. When it rained, he would have to stand to be clear of water. (**ECF No. 72-4 ¶ 6**); (**ECF No. 78 ¶ 6(e)**). Nibbs was fed rice and beans three times a day and at times given tuna and chicken, but his requests for snacks were denied. (**ECF No. 78 ¶ 6(f)**). Nibbs was showered with a hose that drew from the same source as his drinking water, which was potable. (**ECF No. 78 ¶ 6(h), (l)**).

Nibbs was required to use a bathroom on deck the ship that was in view of other detainees, which at times included minor children. (**ECF No. 72-4 ¶ 6**); (**ECF No. 78 ¶ 6(i)**). Nibbs stated in his deposition that the toilet facility failed to provide adequate privacy and that others were able to see him when he used the bathroom, including two migrant children during the four days they were on board the ship on which he was detained. (**ECF No. 61 ¶ 19**). Other detainees, including intercepted migrants, used the same bathroom facilities. (**ECF No. 78 ¶ 6(i)**). While he was using the bathroom, a Coast Guard cutterman would stand next to him to ensure he did not jump overboard while unshackled. *Id.*

On July 22, 2022, the Coast Guard put Nibbs ashore in Puerto Rico. (**ECF No. 61 ¶ 4**). Once in Puerto Rico, the United States charged Nibbs with drug trafficking. (**ECF No. 61 ¶ 5**). Nibbs moved to dismiss the indictment, in part, on the grounds that the

Coast Guard violated Federal Rule of Criminal Procedure 5(a)(1)(B) due to his excessively long detention and alleged mistreatment and improper interrogation before being presented before a magistrate judge. (**ECF No. 61 ¶¶ 6–8**); *United States v. Nibbs*, No. 22-cr-340-FAB, Dkt. No. 43 (D.P.R. Nov. 14, 2022). Judge Besosa denied Nibbs's request for an evidentiary hearing and subsequently denied the Motion to Dismiss the Indictment, partially on the grounds that Nibbs was not excessively detained nor mistreated such that the Coast Guard violated Federal Rule of Criminal Procedure 5(a)(1)(B). (**ECF No. 61 ¶¶ 10–14); ***United States v. Nibbs*, 643 F. Supp. 3d 299 (D.P.R. 2022). Nibbs was thereafter convicted of drug trafficking. (**ECF No. 61 ¶ 15**).

### C. Analysis

#### i. Applicable Waiver of Sovereign Immunity

The United States, as sovereign, is immune from suits for damages except to the extent that it has waived sovereign immunity via applicable legislation. *See Thames Shipyard and Repair Co. v. United States*, 350 F.3d 247, 253 (1st Cir. 2003). Nibbs brings a claim under the Public Vessels Act ("PVA") and Suits in Admiralty Act ("SAA"), or, in the event those statutes do not apply to his claim, the Federal Torts Claims Act ("FTCA"). Because the applicable substantive law under these statutes differs, the Court must first decide which, if any, governs Nibbs's claim.

The FTCA acts as a waiver of the federal government's sovereign immunity and ordinarily applies to tort actions brought against the government; however, "its provisions are generally inapplicable when an admiralty claim exists." *Harrington v. United States*, 748 F. Supp. 919, 927 (D.P.R. 1990). In such admiralty cases involving public vessels, the government's sovereign immunity is waived via either the PVA or the SAA. *Uralde v. United States*, 614 F.3d 1282, 1286 (11th Cir. 2010).

In order for admiralty jurisdiction to attach to claims in tort, the alleged tort must be maritime in nature. *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253 (1972). For a tort claim to be considered maritime in nature, (1) "the 'wrong and injury complained of must have been committed wholly upon the high seas or navigable waters,'" and (2) "the wrong must 'bear a significant relationship to traditional maritime activity.'" *Harrington*, 748 F. Supp. at 927 (quoting *Executive Jet Aviation*, 409 U.S. at 253)). In the case at bar, the first prong is clearly met because the actions alleged by Nibbs were committed upon the high seas. *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 863–64 (1986) (describing the requirement as a "locality requirement—that the wrong must have occurred on the high seas or navigable waters."). With respect to the second element, the Coast Guard's enforcement of prohibitions of smuggled goods has "since ancient times . . . been an important maritime activity." *Harrington*, 748 F. Supp. at 928 (citing The Articles of Inquisition, adopted at Quinnborow in the year 1376); *see also Kelly v. United States*, 531 F.2d 1144, 1148 (2d Cir. 1976) ("It would be impossible to find an agency of our government with a closer relationship to maritime activity [than the Coast Guard]."). Because Nibbs's claim arises directly out of the Coast Guard's treatment of him on the high seas while conducting law enforcement activities, the alleged tort is plainly maritime in nature and the FTCA is therefore inapplicable. *See Harrington*, 748 F. Supp. at 927.

Nibbs's Amended Complaint waffles between stating that the PVA and the SAA apply to his claim without drawing a meaningful distinction between the two. (**ECF No. 14**). The Government, without addressing the SAA, assumes that the PVA governs Nibbs's claim. (**ECF No. 60 at 11 n. 3**). The PVA allows for civil suits against the United States for "damages caused by a public vessel of the United States[.]" 46 U.S.C. § 31102(a)(1).

"The Supreme Court has held that claims for damages 'caused by a public vessel,' include not just those cases in which the vessel is the physical instrument causing the damage, but also 'cases where the negligence of the personnel of a public vessel *in the operation of the vessel* causes damage to other ships, their cargoes, and personnel.'" *Uralde*, 614 F.3d at 1285 (quoting *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 224–25 (1945)). The SAA "waives sovereign immunity 'in cases where if such vessel were privately owned or operated . . . or if a private person or property were involved, a proceeding in admiralty could be maintained[.]" *Thames Shipyard and Repair Co.*, 350 F.3d at 253 (quoting 46 U.S.C.A. § 742). Because "[b]oth the Suits in Admiralty Act and the Public Vessels Act apply when a plaintiff brings a public-vessel-related suit in admiralty against the United States," the Court concludes that both statutes apply to this action and waive the Government's sovereign immunity to be sued under admiralty jurisdiction. *Wilson v. United States*, 23 F.3d 559, 561 (1st Cir. 1994) (internal quotations omitted); *see also Thames Shipyard and Repair Co.*, 350 F.3d at 253–54 (holding that both statutes applied to waive sovereign immunity in a claim alleging negligence against the United States for the actions of Coast Guard personnel at sea).

### A. Scope of NIED Under General Maritime Law

Plaintiff's alleged damages are "[p]ain and suffering for emotional, moral anguish, and psychiatric conditions" in the amount of $5 million. (**ECF No. 14 ¶ 38**). Plaintiff does not assert any other form of damages, physical or otherwise. Because this case arises under admiralty jurisdiction, general maritime law as developed by the federal courts is the applicable substantive law. *East River S.S. Corp.*, 476 U.S. at 864. "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Id.* at 864–65. As traditional

common law conceptions of tort have expanded over time, so too has the general maritime law. *See id.* (tracing the expansion of the judicially created doctrine of products liability and incorporating it into maritime law); *Petition of United States*, 418 F.2d 264 (1st Cir. 1969) (observing that "it is almost uniformly recognized that recovery may be had for the physical consequences of mental disturbance, at least where there is some contemporaneous physical impact also resulting from defendant's negligence" and recognizing such an action under general maritime law).

As a preliminary matter, the Court recognizes that Nibbs's claim for "[p]ain and suffering for emotional, moral anguish, and psychiatric conditions" is a claim for purely "emotional" damages. (**ECF No. 14 ¶ 38**). Although modern rhetoric and commonsense understandings of mental health may draw a sharp distinction between emotions, such as fear, and psychiatric conditions, such as post-traumatic stress disorder, the term "emotional distress" persists in tort law as a term of art which encapsulates both emotions and mental and physical reactions to severe emotional stimuli. As summarized by the Restatement (Third) of Torts: Physical & Emotional Harm, "[e]motional harm encompasses a variety of mental states, including fright, fear, sadness, sorrow, despondency, anxiety, humiliation, depression (and other mental illnesses), and a host of other detrimental—from mildly unpleasant to disabling—mental conditions." § 45 cmt. a. The success of Plaintiff's claim therefore turns on whether the general maritime law recognizes an action for negligent infliction of emotional distress in circumstances such as those experienced by Plaintiff.

At common law, purely emotional or mental damages were not recoverable in tort. *See* Martha Chamallas & Linda K. Kerber*, Women, Mothers, and the Law of Fright: A History,* 88 MICH. L. REV. 814, 816–19 (1990) (tracing the history of the gendered

approach to denying recovery for emotional harms). This prohibition on recovery for emotional harms was grounded in an understanding that such injuries were incapable of being recognized or quantified by courts and that the traditional elements of negligence would not extend to such injuries. *See Lynch v. Knight*, 9 H.L. Cas. 576, 11 Eng. Rep. 854, 863 (1861) (Wensleydale, L.) ("Mental pain or anxiety the law cannot value, and does not pretend to redress, when the unlawful act complained of causes that alone[.]"); *Escobar-Santana v. State*, 298 A.3d 1222, 1232 (Conn. 2023) (explaining that "the common law traditionally was loathe to afford recovery for purely emotional injuries" because of concerns regarding "the potential for trivial, frivolous or fraudulent claims, as well as the difficulties involved in tracing the etiology of psychological harms.") (internal quotations omitted).

Over time, however, as scientific and societal conceptions of mental health have evolved, courts have steadily, albeit unevenly, expanded the traditional common law rule to allow for recovery of damages based on negligent infliction of fear and mental and emotional suffering under limited circumstances.[4] *See, e.g.*, *Potere v. City of Philadelphia*, 112 A.2d 100, 104 (Pa. 1955) (ruling that testimony by a neuro-psychiatrist established that the "anxiety state" was not caused by defendant, but noting that "where . . . a plaintiff sustains bodily injuries, even though trivial or minor in character, which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the Plaintiff, then mental suffering is a legitimate element

[4] It should be noted that *intentional* infliction of emotional distress has followed a different path of development and allows for recovery in broader circumstances removed from threats of physical harm. *See, e.g., Muratore v. M/S Scotia Prince*, 845 F.2d 347 (1st Cir. 1988) (ruling that actions of photographers who persistently verbally harassed a cruise patron who did not want their picture taken constituted intentional infliction of emotional distress under Maine law). For reasons that are unclear to this Court, however, Plaintiff explicitly disclaimed any theory based in intentional tort. *See* (**ECF No. 72-1**) (stipulating that Plaintiff's sole cause of action is negligence under general maritime law).

of damages."); *Robb v. Penn. R. Co.*, 210 A.2d 709 (Del. 1965) (holding that a plaintiff "within the immediate area of physical danger" could recover for physical manifestations of fright, but that "it is accepted as settled that there can be no recovery for fright alone, not leading to bodily injury or sickness, arising from the negligence of another."); *Dillon v. Legg*, 441 P.2d 912 (Cal. 1968) (holding that a mother who witnessed the death of her infant child could recover in negligence for emotional trauma and noting that "[t]o deny recovery would be to chain this state to an outmoded rule of the 19th century which can claim no current credence."). Today, most courts recognize some form of action in negligent infliction of emotional distress. *See Consolid. Rail Corp. v. Gottshall*, 512 U.S. 532, 555 (1994); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 47 cmt. b.

In *Petition of the United States*, the First Circuit recognized that a claim of NIED is cognizable under the general maritime law. 418 F.2d 264, 269 (1st Cir. 1969). Exhaustively surveying federal and state decisions, the Court observed that it was "almost uniformly recognized that recovery may be had for the physical consequences of mental disturbance, at least where there is some contemporaneous physical impact also resulting from defendant's negligence." *Id.* at 268. This requirement of "contemporaneous physical impact also resulting from defendant's negligence" is generally known as the physical impact test and addresses concerns regarding both the existence of a duty of care—since the defendant owes a duty to avoid the physical impact—and the validity of the claimed emotional injury. *See Gottshall*, 512 U.S. at 546–47; *Gates v. Richardson*, 719 P.2d 193, 194–196 (Wyo. 1986). Subsequently, the First Circuit in *Sawyer Brothers, Inc. v. Island Transporter, LLC* ruled that the Supreme Court's adoption of the "zone of danger" test in claims under the Federal Employers' Liability Act ("FELA") in *Consolidated Rail*

*Corporation v. Gottshall* was also applicable to claims under general maritime law. 887 F.3d 23, 37–38 (1st Cir. 2018) (citing *Gottshall*, 512 U.S. at 554). The plaintiffs in *Sawyer* were truck drivers who engaged the defendant to transport them and their trucks across Penobscot Bay. The captain of defendant's vessel disregarded forecasts of dangerous seas and failed to lash down plaintiffs' trucks before setting out to cross the bay. Once underway, heavy waves caused two of the plaintiffs' trucks to tip over against the side of the vessel with their drivers inside, causing those drivers and a third watching from the cabin of an unlashed truck that did not tip over to fear for their lives. Although none of the drivers were physically injured, the district court awarded each driver damages for their emotional distress. The First Circuit ruled that plaintiffs were able to recover in NIED despite not sustaining physical impacts because they were within the "zone of danger" created by defendant's negligent decisions. *Id.* at 37–41. "A plaintiff is within the zone of danger if he sustains a physical impact, or is 'placed in immediate risk of physical harm' by a defendant's negligent conduct. *Id.* at 38 (quoting *Gottshall*, 512 U.S. at 548).[5] Accordingly, *Sawyer* is clear that a plaintiff can sustain an action in NIED under general maritime law if he is within the zone of danger or suffers a physical impact involving a fear of immediate physical harm.

**i. Zone of Danger Test**

The Government argues that Nibbs cannot recover for his emotional injuries related to the manner in which he was forced to use the bathroom in front of others

[5] The First Circuit explicitly left open the question of whether a "physical consequence" of the emotional injuries that is "susceptible of objective determination"—e.g. heart attacks, stress induced shingles, ulcers—is required under general maritime law, as some courts have required. *Id.* at 39–40. Nibbs presents no evidence or allegations that his emotional injuries resulted in any such manifestations. Nevertheless, because he fails to show any fear of imminent physical harm, the Court need not reach this question.

because such conduct did not involve a physical impact nor place him in the zone of danger of imminent physical harm. (**ECF No. 60 at 11**). It is not apparent to this Court, however, why the zone of danger test would only preclude Nibbs's bathroom-related theories of negligence, as opposed to precluding Nibbs's claim in its entirety. Nibbs puts forth no evidence or arguments that any of the conduct engaged in by the Coast Guard put him at risk of imminent physical harm or that he feared such harm.[6] *See Sawyer*, 887 F.3d at 38 ("A plaintiff is within the zone of danger if he sustains a physical impact, or is 'placed in immediate risk of physical harm' by a defendant's negligent conduct."). To the contrary, the harm claimed by Nibbs is plainly grounded in discomfort, dignitary affronts, and perceived discrimination that he suffered while on board Coast Guard cutters. Such injuries are not recoverable under the zone of danger test.[7] *Id.*

While some of the purportedly negligent detention conditions involve physical contact—namely, that he was "chained to the [] deck of multiple US Coast Guard Cutters, exposed to the elements of rain saltwater spray, and sun for weeks non-stop, . . . [and] was hosed down like a dog,"[8]—"the words 'physical impact' do not encompass every form of 'physical contact.'" *Metro-North Commuter R. Co. v. Buckley*, 521 U.S. 424, 432 (1997)); *see also Wahlstrom v. Metro-North Commuter R. Co.*, 89 F. Supp. 2d 506, 517 (S.D.N.Y. 2000) (stating that the Court in *Buckley* "implied that the term applies only to contact that causes 'immediate traumatic harm'"). Nibbs does not argue that he was

---

6 For his part, Plaintiff does not argue that he was within the zone of danger at any point during his voyage. Nor does he allege any fear of physical harm. Rather, Plaintiff argues that the traditional limitations of NIED do not apply to him because, rather than simply asserting a theory of action under NIED, he also alleges negligence under a theory of "general negligence." (**ECF No. 72 at 5**).

7 Assuming, arguendo, that Plaintiff's injuries were cognizable in negligence, it is unlikely that he could survive summary judgment given that he has failed to provide any evidence of the existence of such injuries.

8 (**ECF No. 72-4 ¶ 6**).

hungry to the point of starvation, sunburned from inadequate coverage, denied water to the point that he feared dehydration, physically assaulted, or in any way feared for his physical safety. Nor does the record contain reference to any incident that "placed him in immediate risk of physical harm." *Sawyer*, 887 F.3d at 38. In short, Nibbs's evidence shows that he was made physically and emotionally uncomfortable, which does not suffice to provide the basis for an action in negligence absent fear of imminent physical harm. *Compare Higgins v. Metro-North R.R. Co.*, 143 F. Supp. 2d 353 (S.D.N.Y. 2001) (holding that a plaintiff could not recover for NIED under FELA for sexual harassment because she did not testify that she was in apprehension of physical or sexual harm), *with Wahlstrom*, 89 F. Supp. 2d at 518 (noting that sexual harassment could give rise to NIED because the plaintiff was struck and "it would be reasonable to assume that she feared her assailant was about to cause her physical harm, particularly in light of the sexual nature of his attack."). Given the absence of any physical impact or near miss that would create a fear of immediate physical harm, Nibbs cannot make out a claim of negligence under the zone of danger test.

**ii. Availability of Other Theories of Negligence**

According to the Government, *Sawyer* holds that a plaintiff cannot advance an NIED claim unless he can show that he was within the zone of danger. (**ECF No. 60 at 11–12**). Therefore, because Nibbs fails to make out a claim under the zone of danger test, the Government concludes that his action in NIED must fail. (**ECF No. 77**). But this reading is not entirely accurate. The First Circuit in *Sawyer* explicitly left open the question of whether "more permissive" tests of NIED were available under general maritime law. 887 F.3d at 38 n. 11 ("This case does not require us to determine whether *Gottshall* counsels against applying the more permissive 'relative bystander' test to

general maritime cases."). In other words, *Sawyer* does not foreclose the possibility that other tests of NIED may exist under the general maritime law. Because Nibbs argues that his claim is cognizable under alternative theories of "general maritime negligence, which does not require the plaintiff to be within a 'zone of danger,'" (**ECF No. 72 at 5**), the question is presented to this Court as to whether general maritime law allows for recovery for emotional harms due to negligence under more permissive standards than those allowed under *Sawyer*.[9] His ability to recover therefore turns on whether "general principles of maritime law" recognizes recovery in NIED for the harm he endured under some other theory.

Broadly speaking, there are two forms of exception that courts have recognized to the requirement that one must fear for their own physical safety in order to recover emotional damages in negligence. The first is the "more permissive relative bystander test" alluded to by the First Circuit in *Sawyer* which, in its various forms, permits family members who witness the injury of loved ones to recover for negligent infliction of emotional harm. *See Sawyer*, 887 F.3d at 38 n. 11; *Blinzler v. Marriott Intern., Inc.*, 81 F.3d 1148, 1154–58 (1st Cir. 1996). Notably, this Court in *Peemoller Sultan v. Pleasure Craft Contender 25'* observed that such an action is cognizable under the general maritime law. 139 F. Supp. 2d 230, 235–36 (D.P.R. 2001) ("As a matter of federal maritime law, a plaintiff may not recover damages for negligent infliction of emotional

---

[9] Nibbs's argument is not so much that the tort of NIED is more permissive than the Government claims, but rather that he has an alternative argument under "general principles of negligence" not subject to the limitations of NIED. *See* (**ECF No. 72 at 5**) (arguing that he need only establish duty, breach, causation, and injury under general maritime law). As outlined above, the general maritime law incorporates the common law tradition that emotional harms due to negligence are only recognized in limited circumstances. Claims for emotional harms as a result of negligent conduct are claims of NIED. Nibbs therefore cannot simultaneously claim damages sounding in emotional harm and argue that the strictures of NIED do not apply to him.

distress for injury sustained by another unless he or she was near the scene of the accident."). This theory is plainly inapplicable to the present circumstances, however, as Plaintiff did not witness any close relations suffer a physical injury.

The second class of exceptions is described by the Restatement (Third) of Torts: Physical & Emotional Harms as relating to "conduct . . . [that] occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm." Restatement (Third) of Torts: Phys. & Emot. Harm § 47(b). This exception is extraordinarily narrow and has generally been recognized only in the context of hospitals or telegraph operators mistakenly informing family members of a loved one's demise, a morgue's mishandling of human remains, and similar situations in which extreme emotional vulnerability is highly foreseeable to those acting negligently and the nature of the relationship is such that recognizing such a duty is appropriate. *See id.* cmt. f. This Court is unaware of, nor has Nibbs cited to, any authority that would support a finding that such "specified categories of activities" includes Coast Guard personnel engaged in law enforcement on the high seas. Law enforcement engaged in the detention of suspected drug traffickers are regulated in their behavior by statute, regulations, and the Constitution; tort law does not impose upon them a duty of care to refrain from negligently inflicting emotional injuries unaccompanied by fears of physical harm. This is especially true in the context of Coast Guard detentions where the nature of life at sea can take a toll on one's mental and emotional health. *See* Decl. of Lt. Comm. Charles M. Chavtur, (**ECF No. 69-5 ¶ 7**) ("Life at sea can be uncomfortable. The conditions aboard fast response cutters . . . are austere for both the crew and for others aboard the vessel, including detainees suspected of drug smuggling."). To be clear, the Court is sympathetic to the extraordinary discomfort

endured by Plaintiff, and it is regrettable that the process to put him ashore took extraordinarily long. But given longstanding jurisprudence cited above, the Court finds no discernable basis to read an unprecedented expansion of NIED into the general maritime law. See *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959) (noting that it is the job of federal courts to "declar[e] the general maritime law, free from inappropriate common-law concepts.").

In conclusion, Nibbs's injury does not fall within any applicable exception to the general rule that one cannot recover for NIED absent a fear of imminent physical harm. Because he claims no injury other than emotional harm, the Court finds there is no dispute of material fact and Nibbs is barred from recovery as a matter of law. Accordingly, the Government's Motion for Summary Judgment at ECF No. 60 is **GRANTED**.

## V. Conclusion

For the aforementioned reasons, the Court finds that summary judgment in favor of the Government is warranted. This case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 14th day of September 2026.

**/s/ María Antongiorgi-Jordán**
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**